UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | | |
|---|---|---|---|
| JOYCE MCDANIEL, | ) | | |
| | ) | | |
| *Plaintiff,* | ) | | |
| v. | ) | No. 1:08-cv-227 | |
| | ) | *Edgar / Lee* | |
| MICHAEL J. ASTRUE, | ) | | |
| Commissioner of Social Security, | ) | | |
| | ) | | |
| *Defendant.* | ) | | |

**MEMORANDUM**

Plaintiff Joyce McDaniel brought this action seeking judicial review of the final decision of the Defendant Commissioner of Social Security ("Commissioner") pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g). On May 16, 2008 an administrative law judge ("ALJ") denied Plaintiff a period of disability and disability insurance benefits ("DIB") and supplemental security income pursuant to the Act, 42 U.S.C. §§ 416(i), 423, and 1382. [Court Doc. No. 7, Administrative Record ("AR"), p. 253]. Plaintiff appealed the ALJ's decision to the Social Security Administration's ("SSA") Appeals Council. On July 25, 2008, the Appeals Council denied Plaintiff's request for review. AR, pp. 8-10. The ALJ's decision became the final decision of the Commissioner. *Id.* Plaintiff seeks judicial review of the ALJ's decision.

In his decision the ALJ made a number of findings. The ALJ determined that Plaintiff last met the Act's disability insured status eligibility requirements on December 31, 2004. AR, p. 255. He also found that Plaintiff had not engaged in "substantial gainful activity" since October 24, 2004. He found that Plaintiff had "severe" impairments of coronary artery disease, degenerative disc disease, and depression. He determined that her combination of impairments

were not medically equal to an impairment listed in 20 C.F.R. Part 404, Appendix 1, Subpart P, Regulations No. 4. *Id.* The ALJ concluded that Plaintiff's complaints of pain were not fully credible and that she had the residual functional capacity to perform "sedentary work activity" with additional limitations of no crawling and no climbing on ladders or scaffolds. The ALJ determined that Plaintiff's current impairments did not prevent her from performing jobs available in both the local and national economies. *Id.*

Following the filing of her appeal in this Court, Plaintiff moved for judgment on the pleadings. [Court Doc. No. 13]. The Commissioner moved for summary judgment. [Court Doc. No. 20]. This Court referred the matter to Magistrate Judge Lee pursuant to 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b). The Magistrate Judge issued a report and recommendation on January 22, 2007. [Court Doc. No. 23]. The Magistrate Judge concluded that substantial evidence supported the ALJ's decision. She recommended affirming the ALJ's decision. *Id.*

The Plaintiff timely objected to the Magistrate's report and recommendation. [Court Doc. No. 24]. This court must conduct a *de novo* review of the portions of the report and recommendation to which objection is made. 28 U.S.C. § 636(b)(1)(c). The court may then either accept, reject or modify the Magistrate's report and recommendation either in whole or in part. *Id.*

The Plaintiff objects to the Magistrate's conclusion that the ALJ gave appropriate weight to the records of Plaintiff's treating physicians. She further contends that the Magistrate Judge ignored significant portions of Plaintiff's medical history and that Plaintiff's educational records constitute new evidence which must be considered and which demonstrate Plaintiff's diminished

mental capacity.  [Court Doc. No. 24].

I.    **Background**

A.    **Plaintiff's Medical and SSA Application History**

In 1997 Plaintiff received a diagnosis of major depression from a physician with
Volunteer Behavioral Health Care System.  AR, pp. 112-13.  In 2001 Plaintiff experienced her
first recorded heart attack and underwent balloon angioplasty, and in March of 2002, her treating
physician, Dr. Robert Berglund, noted an abnormal EKG and his impression of atherosclerotic
heart disease.  AR, p. 132-34.

In April of 2002, Plaintiff underwent gallbladder surgery for removal of gallstones.  AR,
p. 136, 217.  In 2002 her treating physician, Dr. George Graves, noted elevated cholesterol and
possible carpal tunnel syndrome.  *Id.* at 194-95.

On August 14, 2002 Plaintiff applied for supplemental security income.  *See* AR, pp.
232-235.  Plaintiff indicated on her first application for social security disability benefits that she
could read English and write more than her name in English.  AR, p. 72.  She further indicated
that she had completed her education through the eighth grade and that she did not attend special
education classes in school.  *Id.* at 79.

On November 15, 2002 the SSA issued Plaintiff a notice of denial of her claims for both
social security and supplemental security income disability benefits.  AR, p. 237-240.  On July
29, 2003 the SSA reconsidered its decision and determined that Plaintiff did not meet the
definition of disabled pursuant to the law.  *Id.* at p. 242-244.  Plaintiff attended a hearing
pursuant to her first request for social security insurance benefits on May 20, 2004.  AR, p. 31.
On October 27, 2004 an ALJ issued a decision denying Plaintiff's initial request for social

security benefits.  *See* AR, pp. 31-35.  Plaintiff did not appeal this determination.

In January of 2004, the record reveals that Plaintiff was treated by the Neurosurgical Group of Chattanooga for headaches associated with a past history of migraines, hypotension, and a past history of hypertension.  AR, p. 452-456.  She received hospital care and medication for her headaches.  Dr. Peter Boehm reported that the "EKG was said to show normal sinus rhythm with anterior infarct of indeterminate age and borderline T waves in the anterior leads. MRI of the brain with MRA did not show any significant abnormalities in my review."  *Id.*  Dr. Larry Paul provided the results of an MRI of Plaintiff's brain, noting "[n]ormal MRI scan of the brain."  AR,p. 454.  The record also includes evidence that Plaintiff may have had mild chronic gastritis.  AR, p. 462.

On June 10, 2004, Plaintiff's treating physician, Dr. Robert Berglund, noted that she was taking aspirin, Evista, Menest, Altace, Zocor, Protonix, Trazodone, and NitroTabs.  He further indicated that:

> [s]he has occasional chest discomfort when she is smoking.  She is not on a beta-blocker.  Review of systems is otherwise all negative without chills, fever, hemoptysis, hematemesis, melena, epistaxis, syncope or near syncope, transient ischemic attacks or stroke symptoms.  Her only complaint besides some intermittent chest discomfort is that of headache.

AR, p. 476.

On April 17, 2005 Plaintiff saw a physician at the North Shore Health Center who indicated some evidence of vertigo and dizziness, as well as arthritis.  AR, p. 487; *see also*, p. 492. On May 19, 2005 a physician from the same medical group diagnosed her with fibromyalgia and depression.  AR, p. 485.

Plaintiff applied for social security benefits a second time on April 4, 2005.  AR, pp. 289-

291.  In her application she detailed symptoms of recurring headaches, pain in her lower back, hips, and legs, as well as her heart condition.  AR, pp. 305-308.  In her daily physical activities questionnaire Plaintiff indicated that she could perform very light housework, make her bed and sometimes bathe herself.  AR, p. 309.  She reported feeling pain if she stood too long and noted that she could stand, walk, or sit for only ten to fifteen minutes at a time.  *Id.*  She further reported using a walker to move around, although the records do not include any prescription from a treating physician for a walker.  AR, p. 310, 315.  She also indicated that she had trouble sleeping, grooming, dressing herself, cooking and performing anything other than light household chores.  AR, pp. 316-317.  She reported watching television, socializing occasionally with family or friends, and talking on the telephone daily with family or friends.  AR, p. 318.  Plaintiff reported walking through her home for exercise and an ability to walk five to ten feet at a time in 15 minutes.  AR, p. 321.

Plaintiff further reported experiencing seizures two times a week for which Dr. Disheroon prescribed Phenobarbital, but the records reveal that Plaintiff was never taken to the hospital for her seizure condition.  AR, p. 324.

On November 15, 2005 a nurse practitioner at Volunteers in Medicine observed Plaintiff for complaints of constant pain, dizziness, and headaches.  AR, p. 638.  The nurse noted essential hypertension, osteoarthrosis generalized, depressive disorder, headache, and joint pain.  She prescribed protonix, nitroquick tablets, zoloft, naproxen, and metprolol.  AR, p. 638.  On November 29, 2005 the SSA initially informed Plaintiff that her request had been denied.  AR, p. 284-287.  Plaintiff requested reconsideration of this decision.

On January 5, 2006 Plaintiff obtained an appointment at Volunteers in Medicine where a

-5-

physician determined a possible diagnosis of carpal tunnel syndrome. AR, p. 637. The record reveals that Plaintiff also experienced a second heart attack in January of 2006. The ALJ reviewed Plaintiff's medical records and noted that "[o]n January 10, 2006, the claimant was hospitalized due to chest pain, shortness of breath, nausea, vomiting and diaphoresis. . . . On January 12, 2006, the claimant underwent catheterization, coronary angiography, and left ventriculography with successful angioplasty and stenting."

AR, p. 258; *see also*, pp. 552-558. On January 18, 2006 Plaintiff provided information to the SSA regarding her second heart attack. She also complained of an inability to lift, bend, sit, or grip due to arthritis; high blood pressure and high cholesterol; sleeplessness; chronic back pain; memory loss; migraines; and depression. AR, p. 325-331. On March 2, 2006 a follow-up examination of Plaintiff's heart by a radiologist revealed that her heart was not enlarged and that her chest was within normal limits. AR, p. 655.

On August 10, 2006 a physician with Volunteers in Medicine in Chattanooga observed Plaintiff for a complaint of constant back and hip pain and numbness in her left leg. AR, p. 628. The doctor, Mary Bean, noted that Plaintiff was walking with a cane. The doctor prescribed Flexeril, Aspirin, and Plavix. *Id.*

On July 21, 2006, upon reconsideration, the SSA issued another decision denying Plaintiff's application. AR, pp. 272-273, 279. On October 10, 2007 Plaintiff appeared before the ALJ in an administrative hearing. She testified regarding her condition from October 28, 2004 through the date of the hearing. AR, p. 12, 22. The Plaintiff was 48 years old at the time of her second SSA hearing in 2007. The record reveals that Plaintiff's past relevant work included grocery store cashier, housekeeper, cook, dishwasher, and knitter. *See* AR, p. 261, 74,

296-304.

On May 16, 2008 the ALJ issued a decision denying Plaintiff's request for social security benefits. *See* AR, pp. 253-263. On July 25, 2008, the SSA Appeals Council declined to review the ALJ's decision dated May 16, 2008. AR, pp. 8-10.

### B.     Medical Consultations Requested by Social Security Administration

On June 1, 2005 Plaintiff received a consultative examination by the Diagnostic Center under direction of the Department of Human Services, Disability Determination Section. AR, p. 500. At that time, the Plaintiff's companion reported that Plaintiff was illiterate. AR, p. 503. In the Diagnostic Center report following an all-systems examination, Dr. Thomas Mullady summarized the Plaintiff's condition in the following way:

> This patient alleged low back pain and has decreased range of motion of lumbar spine on physical examination. The patient stated that her back pain is so severe that she must stop to rest every two to three steps when she walks. However, after the examination she was observed walking down a long hallway with no rest stops and in no apparent distress.
>
> The patient states that she has had a myocardial infarction and has had coronary angioplasty. She [has] episodes of chest pain that have no relationship to physical activity. She also has gastroesophageal reflux disorder and a history of grand mal seizures that occur infrequently. The patient has a limited formal education and is illiterate. She also has a mild decrease in visual acuity but does not wear glasses.

AR, p. 504. Dr. Mullady noted the following restrictions in work that Plaintiff could perform: occasionally lift 10 pounds; frequently lift and carry only less than 10 pounds; standing or walking only 2 hours in an 8-hour workday; only occasional climbing, balancing, kneeling, crouching, crawling or stooping. AR, pp. 506-509.

On November 11, 2005 Art Stair, M.A. performed a psychological evaluation on Plaintiff for the Tennessee Disability Determination Services. AR, pp. 516-526. The examiner found

-7-

that Plaintiff's "overall cognitive abilities appeared to be in the upper borderline intellectual functioning range to possibly the lower average range." AR, p. 518. In determining that the Plaintiff was malingering with respect to her alleged memory loss, the examiner noted the following:

> The claimant's primary complaint is her lack of memory. She appears to be unable to remember almost anything about her past. However, she curiously recalled what her boyfriend has told her about her past when I pressed her for answers. At other points throughout the interview, the claimant easily recalled things such as the age of her children. However, she appeared to not remember whether or not she had been to jail or whether she had ever been abused. Generally speaking, in cases of true dementia, the claimant will have a reasonable idea of major aspects of her life. They may have more difficulty recalling things such as their children's current age. This particular claimant exhibits the opposite of these traits. Accordingly, memory malingering was very highly suspected even before malingering test[s] were given. The claimant's test results clearly demonstrate that the claimant has malingered regarding her memory. . . . Given that the claimant is apparently malingering memory, it is likely that she has intentionally under performed on the WAIS-III as well. The claimant scored a Full Scale IQ of 61. This does not appear to represent the claimant's overall level of functioning. Though the claimant is not necessarily well educated, she does appear to this examiner to have a true Full Scale IQ of approximately 80 to 85.

AR, pp. 519-520.

On May 15, 2006 Plaintiff received another examination by Dr. Mullady of the Diagnostic Center as directed by the Department of Human Services, Disability Determination Section. AR, p. 581-584. Plaintiff complained of memory loss due to a "stroke" following her 2006 heart attack. AR, p. 581. Dr. Mullady noted that the "patient alleges a history of stroke but physical examination reveals no evidence of residual stroke damage." AR, p. 583. After a physical examination and review of Plaintiff's medical history, Dr. Mullady opined the following:

> In relation to the impairments the patient retains the capacity to occasionally lift and/or carry for up to 1/3 of an eight hour workday a maximum of ten pounds.

-8-

She would not be able to frequently lift and/or carry from 1/3 to 2/3 of an eight hour workday any amount of weight. She would be able to stand and/or walk with normal breaks for a total of at least two hours in an eight hour workday and would be able to sit with normal breaks for a total of about six hours in an eight hour workday.

AR, p. 584.

On July 3, 2006 David Caye performed a psychological examination on Plaintiff. AR, pp. 591-597. Plaintiff informed Mr. Caye that she had hobbies such as making "odds and ends out of construction paper such as flowers and trees," sewing, watching television and movies, coloring and playing games. AR, p. 593-594. She also informed him that she occasionally makes sandwiches. *Id.* at 594. Following his examination, Mr. Caye concluded:

Results are seen as invalid. Multiple inconsistencies regarding symptoms related to actual presentation were also present including her indicating needed [sic] two and three presentations of a single question to comprehend or recall. No such deficits noted during interviewing. Symptom magnification was highly indicated as was likely malingering. Level of functioning cognitively is likely in the borderline range but cannot be estimated based on today's findings and Axis V GAF cannot be estimated given the high level of inconsistency, irregularity and likely invalidity of much of her report and mental status.

AR, p. 596.

On November 16, 2005 a physician contracting with the SSA performed a physical residual functional capacity assessment on Plaintiff. AR, p. 527. The functional capacity assessment indicates the doctor's opinion that Plaintiff could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, sit for about 6 hours of an 8-hour workday, with some limitations in balancing, stooping, kneeling, crouching, and crawling and a need to avoid concentrated exposure to extreme cold, extreme heat, wetness, and humidity. AR, pp. 527-532. Plaintiff provided insufficient evidence of her true condition for the psychiatric review to reveal an accurate picture of her abilities. *See* AR, pp. 535-548.

On January 7, 2008 the Plaintiff received another all systems examination by Dr. Mullady. AR, pp. 667-670. He noted a history of myocardial infarctions and coronary angioplasties with stents, allegations of chest and low back pain, history of bilateral carpal tunnel syndrome, obesity, hypertension, illiteracy, and decreased visual acuity. *Id.* at 669. Dr. Mullady noted that Plaintiff's work restrictions should include only occasional lifting of up to 20 pounds, occasional carrying of only up to 10 pounds; sitting for four hours, standing for 30 minutes, and walking for 10 minutes without interruption; sitting for a total of 8 hours in a workday, standing for a total of 2 hours in a workday, and walking for a total of 1 hour in a workday. AR, pp. 671-672. He further indicated that Plaintiff should never climb ladders or scaffolds and should only occasionally climb stairs or ramps, balance, stoop, kneel, crouch or crawl. AR, p. 674. He recommended that Plaintiff never work in unprotected heights or operate a motor vehicle and should only occasionally be exposed to moving mechanical parts, extreme cold, extreme heat, or vibrations. AR, p. 675.

C.      **The Hearing**

As noted *supra*, on November 29, 2005 the SSA notified Plaintiff of its initial decision to deny her second application for disability benefits. AR, p. 684-688. On July 21, 2006 the SSA notified Plaintiff that it had decided to uphold its previous denial of her application for disability benefits. AR, pp. 678.

On October 10, 2007 the Plaintiff and a vocational expert, Rodney Caldwell, testified before the ALJ at an administrative hearing. Plaintiff testified that she was 48 years old and had completed the seventh grade. AR, pp. 722-23. She testified that her last job was as a grocery store cashier and that the position ended in October of 2004. She had also performed prior work

as a housekeeper in a nursing home and as a cook and dishwasher in restaurants. Plaintiff further testified that she had experienced two separate heart attacks and had received a stent in January of 2006. *Id.* at 724. She indicated that she takes high blood pressure pills, Plavix for her heart and nitroglycerin for pain in her chest. *Id.* at 725. Plaintiff testified that she also has back pain for which she takes Nuprin and depression for which she takes Zoloft. *Id.* at 727-28. However, she acknowledged that she has not had any mental health treatment due to lack of insurance or money. She further alleged experiencing pain in her hands due to arthritis. *Id.* at 728-29.

Plaintiff testified that her daily activities included vacuuming her bedroom and that she could only stand and move around for thirty minutes at a time. She indicated that she had not driven for the past eighteen months. She also indicated that she could only walk for about 30 yards without stopping. AR, pp. 730-31.

The ALJ then listened to the testimony of a vocational expert, Rodney Caldwell. The ALJ asked Mr. Caldwell what sedentary jobs Plaintiff could perform given that she was 48 years old with an eighth grade education with a low IQ and a need for simple instructions. The vocational expert indicated that Plaintiff could perform a sedentary assembly job. Mr. Caldwell testified that there were 1,000 assembly jobs locally and 100,000 nationally and that there were 300 production inspection jobs available and 32,000 nationally that Plaintiff would be capable of performing. After compensating for a sit/stand option, the vocational expert testified that there would be about half as many jobs available that allowed for sitting and standing and that none of the job options would provide for leaving the workstation at will. AR, pp. 722-23.

### D.    The ALJ's Decision

On May 16, 2008 the ALJ issued his decision denying Plaintiff's request for benefits.

-11-

AR, pp. 250-263. The ALJ's decision noted that Plaintiff had completed a prior application for disability insurance benefits and supplemental security income in August of 2002. The ALJ clarified that he considered evidence after October 27, 2004, the date of the first ALJ decision, in making his determination of whether Plaintiff was entitled to benefits. AR, p. 254.

As indicated *supra*, the ALJ found that Plaintiff last met the insured status requirements on December 31, 2004 and that she had not engaged in substantial gainful activity since October 28, 2004. He further determined that Plaintiff had the severe impairments of coronary artery disease, degenerative disc disease, and depression but that her impairments or combination of impairments did not meet or equal any of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1. AR, p. 256.

The ALJ then considered the medical evidence in the record, including records supplied by Dr. Mullady and Dr. Berglund, Plaintiff's treating cardiologist. The ALJ also reviewed records of consultative psychological evaluations requested by the SSA.

In reviewing the Plaintiff's credibility, the ALJ found the following:

> In assessing the claimant's credibility the record shows she advised Dr. Mullady that she used a walker to help ambulate at home and her back pain was so severe that when walking she has to stop and rest every few steps. However, upon leaving his office she was observed to walk down a long hall with no rest stops and in no apparent distress. She also advised Dr. Mullady she experienced sharp anterior chest pain about once or twice a month but the same month she advised her cardiologist that she only had intermittent chest discomfort when she was smoking. During her psychological evaluation the claimant alleged being unable to remember hardly anything but yet was able [to] remember everything her boyfriend had told her about her past. She did not demonstrate this degree of memory loss during any other examination. Observations in a "face to face" interview with district office personnel revealed no problems with seeing, hearing, using her hands, writing, sitting, standing or walking. She showed no difficulty standing after the lengthy interview and started walking fine but then slowed down. When seen by Dr. Caye the claimant insisted she routinely needed to be told things two and three times for her to comprehend but at no time did she

-12-

ask Dr. Caye to repeat any questions during the interview. At the hearing the claimant was able to testify about her conditions and treatment history as well as her past work history without demonstrating any memory problems. In May 2006 she advised Dr. Mullady she has had short-term memory problems since experiencing a stroke in early 2006. However, there is no documentation of a stroke in the claimant's medical records. These inconsistencies do nothing to enhance the claimant's credibility. Furthermore, no treating or examining physician has opined the claimant is totally disabled and unable to perform substantial gainful work activity at all exertional levels.

Regarding activities of daily living, the claimant reported being involved in a wide variety of activities. She reported spending a good deal of time making "odds and ends" out of construction paper and coloring. She spends time watching television and movies, sewing, playing games, talking on the telephone, and visiting with family and friends. She denied performing household chores but did admit she is responsible for keeping her room clean, folding clothes, and in January 2008 she reported cooking meals three times a week. I find this level of activity is not inconsistent with sedentary work activity.

AR, pp. 260-61. The ALJ then concluded that the "exertional requirements of the claimant's past relevant work exceed [Plaintiff's] established residual capacity." AR, p. 261.

The ALJ found that Plaintiff was a younger individual under the regulations, 20 C.F.R. §§ 404.1563 and 416.963, because she was aged 45 at the alleged onset of her disability. He further determined that the Plaintiff has a limited education and is able to communicate in English, pursuant to 20 C.F.R. §§ 404.1564 and 416.964. The ALJ finally concluded that jobs existed in significant numbers in the national economy that the Plaintiff could perform and determined that Plaintiff was not disabled under the Social Security Act.

E.      Plaintiff's Educational Records

Plaintiff provided this court with some of her educational records from the Chattanooga Public Schools. [Court Doc. No. 14-1]. The records include a psychological examination from 1971 and some of Plaintiff's report cards from various years. The test interpretation section of the psychological examination stated the following:

-13-

Joyce scored within the borderline "mildly retarded" to "dull normal" range of intelligence, although considerable test scatter was indicative. All verbal areas were low or deficient but performance or manipulative abilities were near average. There were mild perceptual deficiencies which would impair higher forms of conceptualization. The low verbal ability was not attributed to mental retardation per se or any specific learning disability but seemed to be the result of some environmental deprivation and suppression. The examiner is suggesting the possibility of home values as being deterrent to intellectual development. Academically Joyce was commensurately deficient, but again there was no evidence of any specific learning disorder. Personal-social skills were immature, but again considering her status, this is to be somewhat expected. There was no apparent emotional disturbance.

Summary and Recommendations
Joyce was believed to have intellectual potential within the dull normal or slow learner range which has been somewhat stymied by cultural experiences and possible suppression of basic achievement drives. No serious learning, perceptual, or emotional problems were detected. Regular class placement with remediation is an obvious recommendation at this time.

[Court Doc. No. 14-1, pp. 9-10].

## II.      Standard of Review

42 U.S.C. § 405(g) states in relevant part:

[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive, . . . .

42 U.S.C. § 405(g).

The Sixth Circuit has outlined the parameters for reviewing the Commissioner's

determination regarding eligibility for DIB in accordance with 42 U.S.C. § 405(g). In *Warner v.*

*Commissioner of Social Security* the Sixth Circuit stated:

'[t]his Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. . . . Substantial evidence exists when a 'reasonable mind might accept' the relevant evidence 'as

-14-

adequate to support a conclusion.' . . . As long as substantial evidence supports the Commissioner's decision, we must defer to it, " 'even if there is substantial evidence in the record that would have supported an opposite conclusion. . . .'

375 F.3d 387, 390 (6th Cir. 2004) (quotations omitted); *see also*, 42 U.S.C. § 405(g); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007). Whether the substantial evidence supports the ALJ's conclusion must be determined by a review of the record as a whole. *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984). The Sixth Circuit has cautioned courts not to "'focus and base [their] decision on a single piece of evidence, and disregard other pertinent evidence.'" *Id.* (quoting *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978)).

The Commissioner's task is to "resolve conflicts in the evidence and to decide questions of credibility." *Felisky v. Bowan*, 35 F.3d 1027, 1035 (6th Cir. 1994). Further, "[t]he substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm." *Id.* (citations and quotation omitted); *see also, Smith v. Chater*, 99 F.3d 780, 781-82 (6th Cir. 1996). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hale v. Secretary of Health and Human Serv.*, 816 F.2d 1078, 1082 (6th Cir. 1987) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971)).

The Sixth Circuit has outlined four legal propositions relating to Social Security Disability cases to consider when making disability determinations:

   1. The burden of proof in a claim for Social Security benefits is upon the claimant to show disability which prevents her from performing any substantial gainful employment for the statutory period. Once, however, a prima facie case that claimant cannot perform her usual work is made, the burden shifts to the Secretary to show that there is work in the national economy which she can perform.

2.  Convincing proof, consisting of lay testimony supported by clinical studies
and medical evidence, that pain occasions a claimant's inability to perform his or
her usual work is sufficient to make a prima facie case.
3.  In determining the question of substantiality of evidence, the reports of
physicians who have treated a patient over a period of time or who are consulted
for purposes of treatment are given greater weight than are reports of physicians
employed and paid by the government for the purpose of defending against a
disability claim.
4.  Substantiality of the evidence must be based upon the record taken as a whole.

*Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980) (citations omitted).

Further,

[u]pon review, we are to accord the ALJ's determinations of credibility great
weight and deference particularly since the ALJ has the opportunity, which we do
not, of observing a witness's demeanor while testifying.  Therefore, we are
limited to evaluating whether or not the ALJ's explanations for partially
discrediting [the claimant] are reasonable and supported by substantial evidence
in the record.

*Jones v. Commissioner of Social Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) (citation omitted); *see*

*also*, *Kirk v. Secretary of Health and Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981) (noting

that "[s]ince credibility, especially with alleged pain, is crucial to resolution of the claim, the

ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be

discarded lightly.'") (quoting *Beavers v. Secretary of Health, Education & Welfare*, 577 F.2d

383, 387 (6th Cir. 1978)); *Walters v. Commissioner of Social Sec.*, 127 F.3d 525, 531 (6th Cir.

1997); *Templeton v. Commissioner of Social Sec.*, 215 F. App'x 458, 462 (6th Cir. Feb. 8, 2007);

*Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001).  However, the credibility determination must

be "supported by substantial evidence."  *Templeton*, 215 F. App'x at 462.

###    III.    Analysis

Plaintiff bears the ultimate burden of establishing an entitlement to disability benefits by

demonstrating the presence of a disability as defined by the Act.  *Moon v. Sullivan*, 923 F.2d

1175, 1181 (6th Cir. 1990). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In addition,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

The Social Security regulations promulgated pursuant to the Act describe a five step "sequential evaluation process" for determining whether a claimant is disabled under the Act. *See* 20 C.F.R. § 404.1520(a)(4). The Sixth Circuit has summarized these five steps outlined in the Social Security regulations:

> In step one, the SSA identifies claimants who 'are doing substantial gainful activity' and concludes that these claimants are not disabled. If claimants get past this step, the SSA at step two considers the 'medical severity' of claimants' impairments, particularly whether such impairments have lasted or will last for at least twelve months. Claimants with impairments of insufficient duration are not disabled. Those with impairments that have lasted or will last at least twelve months proceed to step three.

> At step three, the SSA examines the severity of claimants' impairments but with a view not solely to their duration but also to the degree of affliction imposed. Claimants are conclusively presumed to be disabled if they suffer from an infirmity that appears on the SSA's special list of impairments, or that is at least equal in severity to those listed. . . . A person with such an impairment or an equivalent, consequently, necessarily satisfies the statutory definition of disability. For such claimants, the process ends at step three. Claimants with lesser impairments proceed to step four.

> In the fourth step, the SSA evaluates claimants' 'residual functional capacity,' defined as 'the most [the claimant] can still do despite [her] limitations.' Claimants whose residual functional capacity permits them to perform their 'past

-17-

relevant work' are not disabled. 'Past relevant work' is defined as work claimants have done within the past fifteen years that is 'substantial gainful activity' and that lasted long enough for the claimant to learn to do it. Claimants who can still do their past relevant work are not disabled. Those who cannot do their past relevant work proceed to the fifth step, in which the SSA determines whether claimants, in light of their residual functional capacity, age, education, and work experience, can perform 'substantial gainful activity' other than their past relevant work. Claimants who can perform such work are not disabled. The SSA bears the burden of proof at step five.

*Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006) (citations and quotations omitted) (relying on 20 C.F.R. § 404.1520(a)(4)).

At Step 3 if a severe impairment is determined to exist, the "'the combined effect of all impairments must be considered, even if other impairments would not be severe.'" *Simpson v. Commissioner of Social Sec.*, No. 08-3651, 2009 WL 2628355 *9 (6th Cir. Aug. 27, 2009) (quoting *White v. Commissioner of Soc. Sec.*, 312 F. App'x 779, 787 (6th Cir. 2009)). Where it is undisputed that a plaintiff can no longer perform her past work, the court must determine "whether substantial evidence supports the ALJ's determination that, based on [plaintiff's] residual functional capacity, age, education, and work experience, she can make an adjustment to other work available in the national economy." *Poe v. Commissioner of Social Sec.*, No. 08-5912, 2009 WL 2514058, *6 (6th Cir. Aug. 18, 2009).

ALJs should generally "give a treating physician's opinion controlling weight 'if the opinion of the treating physician as to the nature and severity of a claimant's conditions is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record . . .'" *Simpson*, 2009 WL 2628355 at *11 (quoting *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 242 (6th Cir. 2007)). An ALJ must provide "'good reasons' for not giving weight to a treating physician in

-18-

the context of a disability determination." *Wilson v. Commissioner of Social Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)). In *Wilson* the Sixth Circuit indicated that the regulation exists "'in part, to let claimants understand the disposition of their cases,' particularly in situations where a claimant knows that his physician has deemed him disabled and therefore 'might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

However, where a treating physician does not describe a plaintiff as disabled, then a treating physician's records do little to establish disability. *See e.g., Foster v. Bowen*, 853 F.2d 483, 488 (6th Cir. 1988) (noting that where treating physician's reports never suggest that plaintiff is disabled by her mental or emotional condition, his reports do little to establish disability by mental condition prior to certain date). A plaintiff seeking disability benefits must not only prove a diagnosis, but also must demonstrate that such diagnosis was disabling to the plaintiff. *See Foster*, 853 F.2d at 489. Further, a treating physician's opinion may not be entitled to deference where it is "based on [plaintiff's] subjective complaints, rather than objective medical data." *Poe*, 2009 WL 2514058 at *7.

The Sixth Circuit has made clear that:

> The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician. Although the ALJ may not substitute his opinion for that of a physician, he is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding. Moreover, an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding.

*Poe*, 2009 WL 2514058 at *7 (citing 20 C.F.R. §§ 404.1546(c), 416.946(c); 404.1545(a)(3),

-19-

426.945(a)(3)) (other citation omitted).

     In this case Plaintiff asserts that the Magistrate Judge failed to consider the records of Plaintiff's treating physicians. It is true that Plaintiff has had at least two documented heart attacks. *See* AR, pp. 72-81, 258, 552-558. The medical records pertaining to her 2006 heart attack do indicate such problems as left atrial enlargement, persistent bilateral lower lobe atelectasis; bibasilar disc atelectasis, and a failure of bibasilar infiltrates. *See* AR, pp. 585, 561, 577. However, Plaintiff does not direct this court's attention to any records from Plaintiff's treating physicians which suggest that Plaintiff is limited in her ability to function and perform daily activities. In other words, Dr. Berglund and Dr. Graves do not appear to provide an opinion regarding their perception of the extent of Plaintiff's disability. Most of the medical records provided by Plaintiff's treating physicians indicate Plaintiff's subjective complaints of pain, but they do not provide insight into the physicians' opinions regarding whether there is a medically-verifiable reason for the varying complaints of pain. Nor did Plaintiff's physicians provide information regarding Plaintiff's possible physical limitations associated with her several different diagnoses. Therefore, the records of Plaintiff's treating physicians are only marginally helpful in this case. *See Foster*, 853 F.2d at 488-89.

     In contrast, Dr. Mullady performed an all-systems examination on Plaintiff on three separate occasions. *See* AR, pp. 500-509, 581-584, 667-670. He supplied the ALJ with functional capacity assessments twice. AR, pp. 506-509, 671-675. These assessments indicated some limitations, but also provided support for the determination that Plaintiff could perform sedentary activity.

     Plaintiff also claims that the Magistrate Judge ignored significant portions of Plaintiff's

medical history. However, although Plaintiff's records indicate a myriad of complaints, including multiple heart attacks, carpal tunnel syndrome, migraines, arthritis, dizziness, back and hip pain, and depression, Plaintiff's records do not reveal medical opinions from her treating physicians indicating Plaintiff's limitations. Plaintiff points to her educational records as support for the notion that she is borderline "mentally retarded." However, the entire context of the records provided indicate a more nuanced picture of Plaintiff's intellectual capacity:

> Joyce scored within the borderline "mildly retarded" to "dull normal" range of intelligence, although considerable test scatter was indicative. All verbal areas were low or deficient but performance or manipulative abilities were near average. . . . The low verbal ability was not attributed to mental retardation per se or any specific learning disability but seemed to be the result of some environmental deprivation and suppression. The examiner is suggesting the possibility of home values as being deterrent to intellectual development. Academically Joyce was commensurately deficient, but again there was no evidence of any specific learning disorder. . . . Joyce was believed to have intellectual potential within the dull normal or slow learner range which has been somewhat stymied by cultural experiences and possible suppression of basic achievement drives. No serious learning, perceptual, or emotional problems were detected. . . .

[Court Doc. No. 14-1]. This summary indicates considerable "test scatter" and a range of possible intelligence capacities with no indication that Plaintiff was ever in special education classes. Further, there are no records from any mental health professionals regarding Plaintiff's depression issues. Instead, there are several records from psychologists asked by the SSA to examine Plaintiff that indicate very clearly that Plaintiff was likely malingering the scope of her intelligence and memory problems. *See* AR, pp. 519-520, 591-597. Although Plaintiff has a lengthy history of medical complaints and ailments, the record lacks objective evidence of the restrictions in her daily life. Most of the evidence is found in the form of Plaintiff's subjective complaints of pain and inability to do anything, but even Plaintiff admitted to an ability to spend

-21-

time making projects with construction paper, coloring, sewing, playing games, and socializing. *See* AR, p. 593-594. Her medical history simply does not indicate how her ailments prevent her from performing even light, sedentary work that would allow her to alternate occasionally between sitting and standing.

Plaintiff also asserts that the Magistrate Judge erred in finding that substantial evidence supports the ALJ's determination that many jobs exist in the national economy which Plaintiff could perform. It is true that the Sixth Circuit has noted that when an individual must alternate between sitting and standing "as required for comfort," then that individual may not be capable of performing sedentary work. *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 498 (6th Cir. 1985). However, in that case "the record clearly show[ed] that claimant cannot sit or stand for long intervals but must be able to move about as she finds necessary." *Id.* at 497. In *Bradley v. Secretary of Health & Human Servs.*, the Sixth Circuit clarified its holding in *Wages*:

> [The plaintiff] argues that the holding in *Wages* automatically precludes any claimant who must alternate between sitting and standing from engaging in sedentary work; therefore making them eligible for benefits. This was not our holding and these are not the circumstances of this case. In *Wages*, this court was unable to identify any substantial evidence in the record indicating that Wages was capable of performing sedentary work. . . . This is not true in this case. All of the medical evidence with the exception of Dr. Gehring's unsubstantiated functional capacity assessment establishes that [the plaintiff] is capable of performing sedentary work. Moreover, *Wages* can be distinguished from this case because the Secretary's determinations were based on an application of the grid rather than the testimony of a vocational expert. This court has recently held that a claimant is not disabled simply based on a need to alternate between sitting, standing and walking if a vocational expert can identify 1,350-1,800 unskilled sedentary jobs out of a total of 540,000 jobs that can be performed within the claimant's limitations.

862 F.2d 1224, 1227 (6th Cir. 1988) (citing *Wages*, 755 F.2d 495 and *Hall v. Bowen*, 837 F.2d 272 (6th Cir. 1988)).

-22-

In addition, the Sixth Circuit has affirmed denials of disability benefits in other cases in which a claimant had a need to alternate sitting and standing. *See e.g.*, *Marcum v. Commissioner, Social Sec. Admin.*, 205 F.3d 1341, 2000 WL 92262 *6 (6th Cir. 2000); *Anderson v. Commissioner of Social Sec.*, 201 F.3d 440, 1999 WL 1206961 *2 (6th Cir. 1999).

In this case Dr. Mullady indicated in his assessment of Plaintiff's residual functional capacity that Plaintiff could sit for about six hours of an eight-hour workday. AR, p. 584. Dr. Mullady opined that while Plaintiff may need to be able to stand and walk at intervals during an eight-hour workday, she still has the capacity to sit for up to six hours of that eight-hour workday. Although Plaintiff has received a string of varying diagnoses of problems over the years, including those relating to her multiple heart attacks, Plaintiff has not directed this court's attention to a place in the record where one of her treating physicians has indicated his opinion on her functional limitations and her inability to perform the requirements of a sedentary job.

Moreover, "[a] vocational expert's testimony can constitute substantial evidence to support the Commissioner's finding that a claimant is capable of performing a significant number of jobs in the economy." *Eades v. Social Sec. Admin.*, No. 99-6190, 229 F.3d 1151, *1 (6th Cir. 2000) (unpublished) (citing *Bradford v. Secretary of Dep't. of Health and Human Servs.*, 803 F.2d 871, 874 (6th Cir. 1986)). Further, where "the vocational expert's testimony was based on hypothetical questions which accurately portray[] [plaintiff's] physical and mental impairments," the Commissioner's determination that a plaintiff is not disabled may be "supported by substantial evidence." *Eades*, 229 F.3d 1151 at *1 (citing *Varley v. Secretary of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)). In posing a hypothetical question to a vocational expert, an ALJ does not have to discuss a claimant's medical diagnoses, but only

-23-

must mention all of the claimant's limitations. *See Webb v. Commissioner of Social Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (citing *Foster*, 279 F.3d at 356). In this case the vocational expert provided testimony that a person with Plaintiff's limitations in intellectual functioning and a need for a sit/stand option would have about 650 local possible jobs and about 66,000 possible jobs nationally. *See* AR, p. 732. This testimony constitutes substantial evidence that Plaintiff can perform work in the national economy.

Plaintiff finally claims that the Magistrate Judge erred by concluding that Plaintiff's educational records did not constitute "new" evidence pursuant to 42 U.S.C. § 405(g). 42 U.S.C. § 405(g) states in relevant part: "the court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g).

With respect to remanding an action for the hearing of additional evidence, the party requesting the remand must demonstrate: "(i) that the evidence at issue is both "new" and 'material,' and (ii) that there is 'good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" *Hollon ex rel. Hollon v. Commissioner of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)) (other citations omitted). Regarding 'new' evidence, the Sixth Circuit has explained that "'evidence is new only if it was not in existence or available to the claimant at the time of the administrative proceeding.' Such evidence, in turn, is deemed 'material' if 'there is a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence.'" *Hollon ex rel. Hollon*, 447 F.3d at 483-84 (quoting *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir.

2001)) (alteration in original).

In this action, even if this court were to conclude that the evidence was "new" and that there was "good cause" for Plaintiff's failure to raise it earlier due to her lack of adequate counsel, this court would still conclude that the evidence is not material. The educational records do not demonstrate that Plaintiff is actually "mentally retarded." Instead, the evidence demonstrates what was already determined by the ALJ– namely that Plaintiff has an eighth grade education with a low IQ and a need for simple instructions. AR, p. 732. The educational records demonstrate that Plaintiff attended regular classes with no special education, that there was "considerable test scatter" in her intelligence test scores, and that her low scores might have resulted from a restrictive home environment rather than from her innate intelligence level. *See* [Court Doc. No. 14-1]. Therefore, the court concludes that the Magistrate Judge did not err in determining that Plaintiff's educational records were cumulative of other evidence in the record and did not fit the requirements of 42 U.S.C. 405(g).

IV.    **Conclusion**

The Court concludes that substantial evidence supports the ALJ's overall determination that Plaintiff was not prevented from performing work available in the national economy and was not disabled within the meaning of the Act. The magistrate's report and recommendation will therefore be **ACCEPTED and ADOPTED**.

The Court will **DENY** Plaintiff's motion for judgment on the pleadings [Court Doc. No. 13] and will **GRANT** the Commissioner's motion for summary judgment [Court Doc. No. 20].

A separate judgment will enter.

_____/s/ R. Allan Edgar_____
R. ALLAN EDGAR
UNITED STATES DISTRICT JUDGE